IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SARA BERRY,

     Plaintiff,

                             **CASE NO.: 4:21-cv-00400-MW-MJF**

v.

NORTHSTAR CONTRACTING
GROUP, INC., and FLORIDA
DEPARTMENT OF ENVIRONMENTAL
PROTECTION,

     Defendants.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Sara Berry, responds to Defendants' NorthStar Contracting Group Inc.'s ("NorthStar") and Florida Department of Environmental Protection's ("DEP") Motions for Summary Judgment [ECF Nos. 47 and 49] and states:

## I.    INTRODUCTION

The discriminatory acts initiated by a DEP employee toward Plaintiff started a landslide of foreseeable negative consequences. Once set in motion, those actions ultimately led to Plaintiff's termination.  As explained *infra*, DEP and NorthStar are joint employers for purposes of applying the Florida Civil Rights Act ("FCRA") and the Rehabilitation Act ("RA"). Thus, they are jointly liable for the acts taken against

Plaintiff.[1]

## II.   <u>OBJECTIONS TO "RECORD EVIDENCE"</u>

In ruling on a motion for summary judgment, a trial court should only consider evidence that may be admissible at trial. <u>See</u> Fed.R.Civ.P. 56(e); <u>Beyene v. Coleman Sec. Servs., Inc.</u>, 854 F.2d 1179, 1181 (9th Cir. 1988). Authentication is a "condition precedent to admissibility;" this condition is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Moreover, in the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804, or 807. <u>See</u> Fed.R.Evid. 802; 30B Federal Practice Procedure: Evidence § 7031 at 279.

As Exhibits 1 and 2, DEP filed a "Contract GC725" [Doc. 48-1] and "Amendment to Contract GC725" [Doc. 48-2]. These are objectionable as unauthenticated hearsay and thus cannot be used to support summary judgment.

As Exhibits 3 and 4, DEP filed "Plaintiff's Application to NorthStar" [Doc. 48-3], "NorthStar Employment Offer to Plaintiff" [Doc. 48-4], and "NorthStar's July 2017 Status Report to DEP with Plaintiff's Attached Spreadsheet" [Doc. 48-6]. It also filed "Natasha Lampkin Supervisor Notes" at [Doc. 48-5] and an email dated

---

[1] Accordingly, one response to their Motions for Summary Judgment is proper because both Defendants are joint employers and, therefore, jointly liable.

June 26, 2017, from Malanie Saunders [Doc. 48-6]. These are also objectionable hearsay.[2]

Also, the Statement of Facts portion of DEP's Motion includes facts supposedly supported by citations to its own website. [Doc. 49, p.2]. Although the website is a ".gov" website, it is objectionable as unauthenticated, self-serving hearsay because it is DEP's own. It thus cannot be used to support either of the Defendants' Motions; otherwise, any governmental defendant could simply edit its website and cite to it as admissible evidence.

As Exhibit 5, DEP filed the Declaration of Natasha Lampkin [Doc. 48-5]; however, it lacks an actual signature. 28 U.S. Code § 1746, by its plain terms, requires a "Signature." Instead, it has Ms. Lampkin's typed name and states, "Digitally signed by Natasha Lampkin," followed by a date. Even if permitted, such a thing fails to qualify as "digital" under local rules designed to allow it. See, e.g., U.S. Bankruptcy Court, S.D. Florida's "Signatures and Document Retention" Local Rule.[3] That is simply not a real signature and cannot possibly convey to its signer the vital importance (and penalties) of the document.

---

[2] Plaintiff however may use these documents, even if used for their truth, as an Admission of a Party Opponent and/or Statement Against Interest. See, e.g., Rules 801(d) and 804.

[3] Available at https://www.flsb.uscourts.gov/local-rule/signatures-and-document-retention and stating, in part:

In sum, both Defendants cannot rely upon DEP's own website, plus Doc. 48-1, Doc. 48-2, Doc. 48-3, Doc. 48-4, Doc. 48-5, Doc. 48-6, and the Declaration of Natasha Lampkin. All left from DEP's Motion are excerpts of Plaintiff's Deposition (Exhibits 5 and 7).

### III.   STATEMENT OF DISPUTED FACTS

### A.   The Defendants are Joint Employers

Plaintiff was working as an "embedded" employee with DEP as a Purchase Requisition Creator. Witt Depo. 13:2-6, 13:15-19, 16:2-5 [Doc. 46-10]. She created purchase requisitions for petroleum, specifically for petroleum clean-ups. Plaintiff's Depo. Vol II 194:15-17 [Doc. 46-5, p. 15].

"Embedded" employees with DEP are so similar to "un-embedded" ones that the only way to tell the difference is by referencing a "contact list." Gracie Depo.,

---

**(A)** Petitions, lists, schedules and statements, amendments, pleadings, affidavits, and other documents which must contain original wet ink signatures or which require verification under Fed. R. Bankr. P. 1008, or an unsworn declaration as provided in 28 U.S.C. § 1746, must be filed electronically and may include, in lieu of the original wet ink signature, a signature in any of the signature types set forth in subparagraphs 1 and 2 of subparagraph B below.

**(B)**   As used in these local rules and the Federal Rules of Bankruptcy Procedure, all of the following constitute a signature on an electronically filed document:

> **(1)**   A copy or digitally scanned image of the entire originally signed document containing a wet ink signature; or

> **(2)**   An original wet ink signature on an original document.

34-35:22-16 [Doc. 46-9]. Moreover, adding to the blurred lines, Plaintiff used DEP's equipment – namely, a computer, when working at DEP. Boring Depo., 49:13-15 [Doc. 46-7].

A DEP employee named Natasha Lampkin assigned Plaintiff work. Lampkin Depo. 6:2-6 [Doc. 46-8]. Ms. Lampkin was "team lead" over the contract unit that Plaintiff worked in for DEP. Id. at 9:14-20. Her job included coordination of Plaintiff's work, assigning her assignments, and reviewing and monitoring Plaintiff's work. Id. at 6:2-6. Ms. Lampkin is even on the application for employment filed by DEP at Doc. 48-3, p. 1:



Ms. Lampkin also admits to acting like Plaintiff's employer; in her Declaration filed with the Court, she says: "I did not want further disruptions of DEP employees by an outside contractor. Therefore, I consulted with the Division's

human resources liaison, as well as the Division Director, and concluded that Ms. Berry should no longer support PRP as an embedded contractor." [Doc. 48-5, p. 4]. She also admits that she "had the ability to remove Ms. Berry from the DEP worksite." Id. at p. 5. Ms. Lamkin even helped to compose the email that effectively removed Ms. Berry from DEP.  [Doc. 48-5, p. 9 (an email dated June 26, 2017, terminating Plaintiff as an embedded contractor, stating in part that "Natasha [Lampkin] and I are composing this email together.")].

In furtherance of her supervisory roles, Ms. Lampkin kept "Supervisor Notes" about Plaintiff. [Doc. 48-5, p. 7]. Those notes include the following entries:[4]

> Wednesday, June 21, 2017:
>
> I pulled the staff from 453A present that day (Kelly, Twilla and Sara) into my office. I indicated that there was some concern over something someone said to Grace regarding Kelly. They indicated that Grace had asked Twilla to go with her to Ken's office to answer questions, but that she was told to get with Natasha. They stated that they did not say anything to Grace bout Kelly or her work. **They also expressed concerns with things that Grace would come into 453A and say to them one example was regarding Sara and her pregnancy being unwed.**
>
> Wednesday, June 21, 2017:
>
> Once Sara, Kelly and Twilla returned to work I made Ken aware of the comment Grace said to Sara regarding her pregnancy and that it was not acceptable to speak this way. **He indicated that this is just Grace and she had a different upbringing than us.** I asked Ken if we could speak with Grace as no one admitted to telling her anything regarding Kelly. He said sure.

---

[4]  Plaintiff objects to Defendants' use of these Supervisor's Notes as hearsay.

Monday, June 26, 2017:

Natasha Lampkin met with Melody Johnson and we agreed with input from Joe Ullo that **Sara Baxley should no longer support PR as an embedded contractor** but could continue to support PRP as an outside contractor at the same level of AA II. Graham Witt agreed and came and informed Sara that she would be working from the Tallahassee Team 5 office.

(emphasis supplied).

The above arrangement is not unique to Plaintiff; Leslie Durkee also used to work for DEP as an "embedded" employee. Durkee Depo. 6-7:22-3 [Doc. 52-1]. Her supervisor was also Natasha Lampkin; she had no supervisor from NorthStar. Id. 7:8-19. In 2016, she applied to work only as an employee of DEP, her supervisor remained the same: Natasha Lampkin. Id. at 9:2-4.

## B.   Plaintiff's Pregnancy

It was known before Plaintiff had her baby that the pregnancy was high-risk. Nadine Mauldin Berry Depo., 59:5-8 [Doc. 52-3]. Plaintiff told Natasha Lampkin that she was experiencing a complicated pregnancy. Plaintiff's Depo. Vol. II, 251:19-24 [Doc. 46-5, p. 72]. Specifically, Plaintiff told Ms. Lampkin she had pregnancy diabetes and that she had a high-risk pregnancy. [Id. at 251-252:25-4]. Plaintiff also told Christy Trueblood, who told Mr. Witt (as they were married). [Id. at  252:10-21, p. 73].  These disclosures all happened before Plaintiff left the DEP. [Id. at 253:1-3, p. 74].

### C.    <u>Grace Rivera's Harassment</u>

In June 2017, Plaintiff complained against Grace Rivera for making an inappropriate comment due to her being unmarried and pregnant. Lampkin Depo. 9:21-25; 10:1-9; 10:18-25 [Doc. 46-8]. Additionally, Ms. Lampkin's Supervisor Notes from June 21, 2017, say that employees other than Plaintiff "expressed concerns that things that Grace would come into 453A and say to them, on example was regarding [Plaintiff] and her pregnancy being unwed." <u>Id.</u> at 15:2-7. Ms. Lampkin was aware that Plaintiff was pregnant, as she was visibly so. <u>Id.</u> at 23-24:23-1.

Grace Rivera had been an employee of DEP for about 33 years.  Rivera Depo., 5:1-6 [Doc. 46-9]. She only worked with Plaintiff for about a week or two when Ms. Lampkin asked Plaintiff to help Ms. Rivera to do cover letters. <u>Id.</u> at 16:9-15. The job Plaintiff was doing was good. <u>Id.</u> 23:18-24. Ms. Rivera commented that Plaintiff was not married, and she even admitted to making it. <u>Id.</u> at 24:4-7; 37:5-10. As Plaintiff testified in her deposition, these comments were both discriminatory and hurtful:

> Q. So let's unpack that one.· You said when the issues first arose at DEP.· When did the issues first arise at DEP, or what was the first incident of discrimination or retaliation in your claim.
>
> A.·The first incident was when a co-worker asked me what the picture on my desk was, and I told her it was an ultrasound picture.· And she then -- now, this is in a big room full of people, too, as well, there was probably about 12 people in the room -- she said "Well, you're not

married."· I said yes, ma'am.· She said "I would feel really bad for that baby.· And you should really bad for having to go through it alone.· That's so sad."

Well, because she said it in front of everybody, I went and told Ms. Lampkin, because it was hurtful.· And that's when not even a -- I think it was not even a week later, maybe, I was told, because I had said something, that it started a lot of stuff, and I was being asked to leave the property.

Plaintiff's Depo.  Vol. II, 232:4-21[Doc. 46-5, p. 53]. Those comments caused Plaintiff to "burst into tears" right away and in front of everyone. Id. at 236:12-17, 233:18-20, 235:11-14 [pp. 54, 56 and 57]; Plaintiff's Depo., Vol. III, 143:17-25; 144:1-9 [Doc. 46-6, pp. 143-144] ("[w]hat? You're not married. You're having a baby? … That's a shame.").

Plaintiff also recounted another incident with Ms. Rivera, subjecting Plaintiff to hostility because of her pregnancy. Plaintiff's Depo., Vol. III, 144:11-21; 145:12-14; 149:22-24 [Doc. 46-6, pp. 144-145,149]. Ms. Rivera found Plaintiff in the bathroom and stated, "[h]ow do you expect to support your child and you're a single person? Don't you want to get married? You should think about that child" and "[h]ave you thought about anything I said previously about, you know, thinking about your child first?" Id.

Plaintiff made a report to Natasha Lampkin (via email) and Mr. Witt (via phone). Plaintiff's Depo, Vol. II, at 236:23-25; 237:6-7; 237-238:20-3 [pp. 56 and 57]. About a week later, Plaintiff was removed from her position at DEP. Id. at

238:9-11 [p. 58]. Ms. Lampkin told Plaintiff it was because Gracie Rivera did not want to be around Plaintiff. Id. at 239-240:20-4 [p. 59].

### D.   Plaintiff's Transfer

The decision to transfer Plaintiff from her position as an embedded employee at DEP was not solely made by Mr. Witt, a NorthStar employee. Witt Depo. 12:14-18 [Doc. 46-10]. The request came from DEP via its employee, Natasha Lampkin. Id. at 12:23-35. Ms. Lamkin only decided to transfer Plaintiff, not Kelly Maxwell or Twilla Wheeler. Lampkin Depo. 24:9-13 [Doc. 46-8]. She told Mr. Witt that Plaintiff should be removed from the DEP office. Id. at 25:7-8; 38:8-17.

Like Mr. Witt, Terry Boring also worked for NorthStar, except as a Human Resource and Payroll Administrator. Boring Depo., 5:1-4 [Doc. 46-7]. He testified that the comment about Plaintiff being pregnant was the basis for her being removed from DEP:

> Q. Okay. have as to why A. I was got that information. And so what information do you she was moved?
>
> A. I was told that there was some type of situation between her and a DEP employee; something having to do with a comment about Sara having been single and pregnant.

Id. at 21-22:21-1. According to him, the reason they moved Plaintiff from DEP was the comment from Grace regarding Plaintiff's pregnancy. Id. 22:11-20. This reason was relayed to Ms. Boring by Gram Witt. Id. at 52:21-25; 51:19-23.

### E.      Plaintiff's New Job at NorthStar

When Plaintiff was moved from DEP, she was transferred from the position of PR Creator to "more of an administrative assistant." Witt Depo. 16:2-5 [Doc. 46-10]. However, while at DEP, Plaintiff "performed purchase requisition tasks as well as administrative tasks on the Contract." Witt Declaration, Paragraph 10 [Doc. 46-3, p. 8], emphasis supplied.

Moreover, within the first six months of February/March of 2020 (i.e., when COVID hit), NorthStar employees started to work remotely. Witt Depo. Doc. 7:19-22; 8:2-5 [46-10]. They continued to work remotely unless they needed to come into the office for something until at least June 9, 2022. Id. at 8:6-17.

### F.      Plaintiff's Termination

NorthStar terminated Plaintiff on December 11, 2017. Witt Depo. 24:9-13 [Doc. 46-10]. Mr. Witt was involved in the decision to fire Plaintiff. Id. at 20:1-6. Other persons involved were the HR representative, Ms. Terry Boring, and Mr. Witt's direct supervisor boss, Brent Anderson. Id. Although supposedly terminated for her absences, NorthStar denied Plaintiff's request to work remotely because it alleges "she was unable to perform the essential functions of her job – scanning and filing documents in the NorthStar offices – remotely." Brent Anderson Declaration, Paragraphs 5 and 6 [Doc. 46-1, p.2].

Plaintiff requested remote work as demonstrated in her December 6, 2017, email to Terry Boring and Graham Witt:

> I spoke with Terry earlier and she explained the situation to me about having billable hours for DEF regarding my position. **Could I possibly work remotely? The Ronald McDonald house has an actual business room for families who have children in the hospital and need to work remotely.** There is internet access, a copier a11d fax machine. If this would be an option, l can come this week or weekend and pick up my laptop with the file boxes for Oculus and bring them here. Would this be a possibility?

Plaintiff's Exhibit [Doc 52-11].[5] NorthStar's decision-makers were thus fully aware of Plaintiff's situation at the Ronald McDonald house and her request for remote work via that location. Id.

During COVID, all of the embedded employees working at DEP worked remotely. Boring Depo., 7-8:21-2 [Doc. 46-7]. Likewise, all of the NorthStar employees that were in the NorthStar office, beginning in or around April of 2020, have continued to work remotely (at least as of June 29, 2022, the date of Ms. Boring's deposition). Id. at 9:19-23.

## IV.   ARGUMENT AND MEMORANDUM OF LAW

---

[5] Other emails between Plaintiff and Defendant, along with important exhibits referenced in the depositions filed by Defendants, are being filed by Plaintiff as her exhibits for both completeness and context.

### A.   <u>Defendants Both "Employed" Plaintiff</u>

The Eleventh Circuit's Pattern Jury Instructions (Section 4.25, Titled Miscellaneous Issues – Joint Employers) states that it is not always clear who is someone's "employer":

> It is not always clear whether the law considers someone an "employee," and it is not always clear who the law considers someone's "employer." Some people, for example, perform services for others while remaining self-employed as independent contractors. Others are clearly employees. **But it may not always be clear who is an employer of the employee. Sometimes an employee may have more than one employer at the same time.**

(emphasis supplied). Section 4.25's notes state that "The Eleventh Circuit determined that the question of employer status under the ADEA intertwines jurisdiction and the merits and so must be resolved by the jury." <u>Garcia v. Copenhaver, Bell & Assoc.</u>, 104 F.3d 1256, 1264 (11th Cir. 1997). Moreover, the Instruction asks the jury "to consider all the following factors <u>to the extent you decide that each applies to this case</u>" (emphasis supplied):

> (a) the nature and degree of control over the employee and who exercises that control;
>
> (b) the degree of supervision, direct or indirect, over the employee's work and who exercises that supervision;
>
> (c) who exercises the power to determine the employee's pay rate or method of payment;
>
> (d) who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;

(e) who is responsible for preparing the payroll and paying wages;

(f) who made the investment in the equipment and facilities the employee uses;

(g) who has the opportunity for profit and loss;

(h) the employment's permanence and exclusiveness;

(i) the degree of skill the job requires;

(j) the ownership of the property or facilities where the employee works; and

(k) the performance of a specialty job within the production line integral to the business.

Finally, the Instruction also says, "Consideration of all the circumstances surrounding the work relationship is essential. No single factor is determinative. Nevertheless, <u>the extent of the right to control the means and manner of the worker's performance is the most important factor</u>." (emphasis supplied).

**1.     Right to Control the "Means and Manner"**

There are many factors referenced in the Pattern Jury Instructions 4.25, and the Instruction indicates that their application is particular to the facts of each case, something the factfinder must decide on their own. However, according to the Jury Instruction's notes, the most important factor is "the extent of the right to control the means and manner of the worker's performance."

Here, Ms. Lampkin was "team lead" over the contract unit that Plaintiff worked in for DEP.   Lampkin Depo., Doc. 46-8, 9:14-20.  Her job included

coordination of Plaintiff's work, assigning her assignments, and reviewing and monitoring Plaintiff's work. Id. at 6:2-6. Her testimony on this issue is:

> Q. Okay. I understand what you're saying. But you supervised her work, did you not?
>
> A. I coordinated her work, yes, and assigned assignments and reviewed what she did. Well, monitored what she did.

Thus, it is undisputed that Ms. Lampkin controlled the "means and manner" of Plaintiff's workplace. Because Ms. Lampkin is indisputably a DEP employee, DEP had the right to control the "means and manner" of Plaintiff's employment. Thus, there is at least a jury issue as to whether DEP was (in addition to NorthStar)[6] Plaintiff's employer.

### 2.    Other Factors Also Weigh in Plaintiff's Favor

Many, if not all, of the other factors mentioned in Pattern Jury Instructions, 4.25 also favor Plaintiff. For example, "the ownership of the property or facilities where the employee works" was indisputably DEP; it owned and operated the location Plaintiff worked while on DEP premises. It also owned the computer that Plaintiff used. Likewise, naturally, DEP would be the entity "who made the investment in the equipment and facilities the employee uses." Moreover, regarding "the degree of supervision, direct or indirect, over the employee's work and who exercises that supervision," that was Ms. Lampkin – a DEP employee; she was even

---

[6] NorthStar is not disputing that it employed Plaintiff.

listed on Plaintiff's job application. In sum, there are more than enough factors for a reasonable jury to conclude that DEP was Plaintiff's employer for purposes of the FCRA.

### B. **Plaintiff's FCRA Claim Presents Jury Issues**

### 1. **Adverse Employment Actions**

Defendants worked to transfer or consented to Plaintiff's transfer from her position at DEP to NorthStar. Accordingly, the transfer is an adverse employment action. Moreover, her termination is an adverse employment action, the foreseeable consequence of them uprooting her from DEP.

### a. This Court Should Adopt the Reasoning in a Recent Case on Job Transfers

Decisions construing Title VII apply to FCRA claims because the FCRA was patterned after Title VII. Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Although some courts have held that a transfer in and of itself is not an adverse employment action, a recent federal court decision has held otherwise.

In that decision, dated June 3, 2020, the Court of Appeals for the District of Columbia Circuit held that "tangible harm" is no longer necessary to establish discrimination when an employee has been transferred. Chambers v. District of Columbia, 35 F.4th 870 (D.C. Cir. 2022), judgment entered, 2022 WL 2255692 (D.C. Cir. 2022). In overturning circuit precedent, the appeals court found that once

it has been established that an employer has discriminated against an employee with respect to that employee's "terms, conditions, or privileges of employment" because of a protected characteristic, "the analysis is complete." Id. at *875. The court determined that any additional requirement was "a judicial gloss that lacks any textual support." Id.

In Chambers, the employee worked for the Office of the Attorney General for more than 20 years before the litigation, first as a clerk and later as a Support Enforcement Specialist and investigator. Id. at *873. She complained that she had a larger caseload than her colleagues, so she sought numerous transfers to different units in the office. Id. Those requests were denied, so she filed a charge of sex discrimination with the Equal Employment Opportunity Commission, contending that similarly situated male employees had been granted the transfers they requested. Id. She then sued, alleging unlawful sex discrimination and retaliation pursuant to Title VII. Id.

Applying previous D.C. Circuit precedent, the district court granted summary judgment against Chambers. Id. The court concluded that she proffered no evidence that denying her transfer requests, even if motivated by discriminatory animus, caused her "objectively tangible harm." Id. That holding was affirmed on appeal by a D.C. Circuit panel, but the panel urged rehearing *en banc*. Id. On rehearing, Chambers argued that the D.C. Circuit precedent was facially inconsistent with Title

VII. Id.; See Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999) (overruled by,

Chambers v. District of Columbia, 2022 WL 1815522 (D.C. Cir. 2022)) (denial or

forced acceptance of a job transfer is actionable under Title VII of the Civil Rights

Act of 1964 only if the employee suffered "objectively tangible harm."). Id.

   After a careful analysis, the court noted that the text of Title VII requires only

that an employer discriminated against an employee's "terms, conditions, or

privileges of employment" to establish a violation. Id. at *874." Once it has been

established that an employer has discriminated against an employee with respect to

that employee's 'terms, conditions, or privileges of employment 'because of a

protected characteristic, the analysis is complete," the court held. Id. at *875. "The

plain text of Title VII requires no more. Any additional requirement, such as

Brown's demand for 'objectively tangible harm, 'is a judicial gloss that lacks any

textual support. Applying the statute as written to discriminatory job transfers does

not, as the dissent claims, create an 'artificial distinction between transfers and

everything else. 'To the contrary, it treats discriminatory transfers the same as any

other discrimination with respect to the 'terms, conditions, or privileges of

employment.'" Id. (citations omitted).

   In so holding, the court rejected arguments that to overrule Brown, would

result in "judicial micromanagement of business practices," making a federal case

out of "[a] salesperson transferred from sporting goods to power tools." Id. at *878.

The court explained:

> But of course, an employer remains free to transfer an employee from one department to another for no reason or for any reason at all—any reason, that is, except the employee's 'race, color, religion, sex, or national origin. 'We disagree with the amicus that refusing to let women work in the power tools department because of gender stereotypes, for example, is part of the 'minutiae of personnel management 'that escapes Title VII's notice. To the contrary, it is exactly the sort of workplace discrimination Title VII aims to extinguish."

Id. (citations omitted). The court also wisely added that employers are protected from frivolous claims by well-established case law. Id. "If a Title VII plaintiff fails to plead 'sufficient factual matter 'to state a discrimination claim that is 'plausible on its face, 'then the district court should dismiss the case before discovery," stated the court. Id. "And under the framework set forth in McDonnell Douglas, a Title VII plaintiff relying upon circumstantial evidence must establish 'an inference of discrimination 'before the burden shifts to the employer to 'identify [a] legitimate, non-discriminatory 'reason for its actions. To survive summary judgment, an employee claiming a discriminatory transfer denial therefore must show not only that the employee's transfer request was rejected, but that it 'was rejected under circumstances which give rise to an inference of discrimination. 'These doctrines provide employers ample opportunity to terminate an unmeritorious discrimination claim without reading an extra-textual limitation into Title VII." Id. at *879

(citations omitted). Likewise, this court should follow the reasoning set forth in Chambers.

> b.   The Transfer Resulted in a Serious and Material
>       Change in Plaintiff's Working Conditions

Even if this Court decides not to follow the well-reasoned opinion in Chambers, there is ample evidence for a jury to find that Plaintiff's transfer was materially adverse. For example, unlike a transfer to another division or department within the same employer, this transfer was to a completely different location. Plaintiff's position changed from the rank of PR Creator to "more of an administrative assistant." She lost the computer she had been working on, one that DEP had supplied. Her co-workers and supervisor (Ms. Lampkin) changed. Her job duties also changed because when Plaintiff was moved from DEP, she was transferred from the position of PR Creator to "more of an administrative assistant." However, while at DEP, Plaintiff "performed purchase requisition tasks as well as administrative tasks on the Contract." Thus, a reasonable jury could easily conclude that such a circumstance change would be both serious and material.

To hold otherwise would mean an employer could do such a "lateral" transfer because they are pregnant. For example, suppose such an action was not held to be materially adverse. In that case, an employer could have a written policy of transferring all pregnant employees to a new job, in a completely different building, with a new supervisor, job title, and working tools (such as their computer). Such a

result would be absurd and inconsistent with the Florida Supreme Court's admonition that the FCRA be liberally construed to effectuate its purpose and promote access to the remedies intended. Joshua v. City of Gainesville, 768 So. 2d 432, 435 (Fla. 2000) ("Like Title VII, chapter 760 is remedial and requires a liberal construction to preserve and promote access to the remedy intended by the [l]egislature."); see also Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975) (explaining that Title VII's central statutory purposes are eradicating discrimination and making persons whole for injuries suffered through past discrimination). Therefore, the Defendants' arguments that a transfer alone is not materially adverse cannot be the proper interpretation of the law.

c.    The Transfer Also Added to the Hostility

NorthStar claims that Ms. Rivera's comments do not create a hostile work environment. However, it ignores that Plaintiff's transfer was part of her working environment. Thus, not only was Plaintiff subject to the comments but she was also subjected to her complete removal from her position at DEP.

Its citation to Wilson v. O'Grady-Peyton Int'l (USA), No. 407CV003, 2008 U.S. Dist. LEXIS 24394, at *50 (S.D. Ga. Mar. 26, 2008), is misplaced because – as opposed to mere comments – Plaintiff's physical self was affected by the transfer. Indeed, the comments Ms. Rivera made, backed up by the DEP supervisor (Ms. Lampkin) via Plaintiff's expulsion from the DEP building, is a hostile working

environment; the definition of altering her "working conditions." See Speedway SuperAmerica, LLC v. Dupont, 933 So. 2d 75, 80 (Fla. 5th DCA 2006); Natson v. Eckerd Corp., 885 So. 2d 945, 947 (Fla. 4th DCA 2004) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 n.3 (11th Cir. 2000) and Castleberry v. Edward M. Chadbourne, Inc., 810 So. 2d 1028, 1029-30 (Fla. 1st DCA 2002)) (requiring that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment). Therefore, especially when combined with the act of uprooting Plaintiff from DEP and stripping her of her computer, the comments made against Plaintiff for being pregnant are especially hostile.

### 2.  Plaintiff Presented Direct Evidence

Plaintiff need not preset a comparator because there is direct evidence that she was transferred because of her condition as a pregnant person. See Akouri v. State of Fla. Dep't of Transp., 408 F.3d 1338, 1347 (11th Cir. 2005) ("blatant remarks, whose intent could mean nothing other than to discriminate" constitute direct evidence). Thus, McDonnell Douglas is inapplicable. See Trans World Airlines, Inc. v. Thurston, 469 U. S. 111, 121 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination").

Here, irrespective of Plaintiff's testimony, Terry Boring (NorthStar's Human Resource and Payroll Administrator) testified that the comment about Plaintiff being

22

pregnant was the basis for her being removed from DEP. According to him, they moved Plaintiff from DEP because of Grace's comment regarding Plaintiff's pregnancy. This reason was relayed to Ms. Boring by Gram Witt; thus, it is at least admissible as an admission against interest (both from Witt to Boring and from Boring).

### 3.    Even if McDonnel Douglas Applies, Jury Issues Remain

As mentioned *supra*, Plaintiff's removal from the DEP premises (along with the taking of her DEP computer) and her ultimate termination are adverse employment actions. There is also no dispute that she was always qualified to do her job. Whether speaking of her FCRA claim or her RA claim, the facts both establish a *prima facie* case and are sufficient for a reasonable factfinder to conclude Defendants' reasons for their actions were pretext.

#### a.    Timing Alone is Sufficient Proof

Even without direct evidence, an employee may be able to establish a causal link based simply on temporal proximity between the statutorily protected activity and the adverse employment action. Thomas v. Cooper Lighting Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Timing alone will be sufficient only when the two events are "very close" in time. Id.

Here, it is undisputed that Plaintiff was transferred while she was pregnant. Not only that, but it occurred just when her co-worker was making remarks about

her pregnancy, which both Plaintiff and others reported to Defendants via Ms. Lumpkin. Mr. Lumpkin, having full knowledge of these complaints, then removed Plaintiff entirely from DEP's premises. She was also terminated well after her child's infirmities became known.

        b.    <u>Ample Comparators</u>

Despite Defendants claiming Plaintiff was transferred for gossiping, Ms. Lamkin only decided to transfer Plaintiff, not Kelly Maxwell or Twilla Wheeler. Moreover, Garcia Rivera kept her job with DEP; only Plaintiff was ejected from her position at DEP.

Although Defendant NorthStar claims that "Berry cannot identify a single similarly situated male employee who was treated more favorably," Plaintiff has pointed to several non-pregnant women who have been treated better (as discussed in the previous paragraph). NorthStar's apparent claim that the comparator has to be male instead of a non-pregnant female is erroneous. <u>See</u>, e.g., <u>Robertson v. Jefferson County Rehabilitation and Health Center</u>, 201 F. Supp.2d 1172, 1178 (N.D. Ala. 2002)(where employees were subject to the same disciplinary rules and the defendant repeatedly disciplined Plaintiff but not other employees for conduct that was very similar to or worse than that committed by the plaintiff, a genuine issue of fact existed precluding summary judgment).

        c.    <u>Changed Reasons</u>

Changing reasons can also support a finding of pretext. <u>Edwards v. United States Postal Serv.</u>, 909 F.2d 320, 324 (8th Cir. 1990) (a record filled with changing and inconsistent explanations supports a finding of pretext); <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997) (plaintiff can show pretext by pointing to inconsistencies or contradictions in the employer's proffered reasons for its actions). In this case, as evidenced by Plaintiff's December 6, 2017, email to Graham Witt, she was in "complete shock" because she had been told not to worry about her position with the company and to take care of herself.  Plaintiff's Exhibit [Doc. 52-11]. Ignoring the possibility that Defendants' litigation reasons for its decisions may be consistent, Defendants' stance on it being acceptable for Plaintiff to take off for her child followed by a demand she comes in less than a week later are still changed reasons precluding summary judgment.

> d.    <u>Lack of a Proper Investigation</u>

An irregular investigation can be evidence of pretext. <u>Trujillo v. PacifiCorp</u>, 524 F.3d 1149, 1159 (10th Cir. 2008). In <u>Trujillo</u>, the court held that the defendant's "irregular" investigation of the plaintiff's alleged misconduct was evidence of pretext. The defendant alleged that the plaintiff had engaged in "time theft" when she reported more time on her timesheet than she actually worked. During its investigation, the defendant did not even interview the supervisor that signed the plaintiff's timesheets. The court held that the defendant's failure to question the

supervisor was evidence of pretext. Id. at 1159. Similarly, in Humphries v. CBOCS West, Inc., 474 F.3d 387, 407 (7th Cir. 2007), the court held that the defendant's failure to get the plaintiff's side of the story when it investigated the plaintiff's alleged misconduct was evidence of pretext. Id. at 407.

Here, the Defendants' lack of a genuine investigation before ripping Plaintiff from her "embedded" position with DEP is proof of pretext. The same holds for her termination, which was the foreseeable result of her not being permitted to work remotely. There is no evidence of any real investigation as to why Plaintiff could not work remotely, especially since others had been able to for things such as COVID.

e.   Defendants' Acted as Ms. Rivera's Cat's Paw

The "cat's paw" theory renders an employer liable if those persons exhibiting discriminatory animus influenced or participated in the ultimate decision to terminate, even if those persons were not the formal decision-makers. See McKenna v. City of Philadelphia, 649 F.3d 171, 177–78 (3d Cir.2011) cert. denied, 132 S.Ct. 1918, 182 L.Ed.2d 773 (2012) ("A 'cat's paw' or 'subordinate bias' theory of liability is 'one in which [the plaintiff seeks] to hold his employer liable for the animus of a nondecisionmaker.' "). As the Supreme Court explained in Staub v. Proctor Hospital, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), when evaluating the "cat's paw" theory with traditional tort-law concepts of proximate cause, "the ultimate decisionmaker's exercise of judgment [does not] automatically render [ ] the link to

26

the [non-decisionmakers'] bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is also a proximate cause of the employment decision." Staub, 131 S.Ct. at 1192 (citing Sosa v. Alvarez–Machain, 542 U.S. 692, 704, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)).

In the instant case, the Defendants were the "cat's paw" of Ms. Rivera's animosity towards Plaintiff's status as a pregnant person. As a result, Plaintiff lost her position at DEP and ultimately lost her job. Both Defendants backed Ms. Garcia's discriminatory animus.

f.    Plaintiff Has Rebutted Defendants' "Legitimate Reasons"

Like the evidence establishing direct evidence, Plaintiff has presented evidence that she was transferred not because of her "rumor" making but because of the DEP worker's problem with her pregnancy. It is also undisputed that Plaintiff's actual work performance was (at a minimum) good at the time of her transfer. Moreover, her termination for absences is a pretext because Plaintiff had requested to work remotely – a request denied by Defendants but offered to numerous other employees. Moreover, there is no clear reason why Plaintiff was not permitted to work remotely when others were, such as with COVID. Thus, their reasons for termination ("continued absence and inability to provide a definitive return-to-work date") are squarely rebutted by Plaintiff's request for a remote job.

### 4.   **Convincing Mosaic**

Defendants argue for the application of the McDonnell Douglas framework. However, the McDonnell Douglas framework "is not the sine qua non for a plaintiff to survive summary judgment in a discrimination case." Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."

Therefore, even if the McDonnell Douglas path is foreclosed, a plaintiff may survive summary judgment if she can "present[ ] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Silver v. City of Pembroke Pines, No. 21-CV-61148-RAR, 2022 WL 2788484, at *6 (S.D. Fla. July 15, 2022), citing Johnson v. Airbus Def. & Space Inc, 858 F. App'x 304, 310 (11th Cir. 2021) (internal quotations omitted). Under that framework, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (alterations omitted) (emphasis added).

Even if all of the above is not sufficient proof under the McDonnell Douglas framework, taken as a whole, it paints at least a jury issue under the

convincing mosaic standard. For example, when faced with the hatred of a long-term employee (Ms. Rivera) to the Plaintiff's pregnancy, the Defendants (through their agent, Ms. Lampkin) choose to support the discriminatory behavior instead of the victim – Plaintiff.

Likewise, Plaintiff's attempt to work remotely (for example, even at the Ronald McDonald House) was inexplicably denied, ultimately leading to her termination for absences. However, her work performance was also, at a minimum, meeting expectations, so there was no real reason she could not work remotely either as an accommodation for the care of her child or as the same accommodation given to other employees.

### C.   Plaintiff's RA Claim Also Presents Jury Issues

"A familial association is an example of a protected relationship under the associational provision of the ADA." Rocky v. Columbia Lawnwood Reg'l Med. Ctr., 54 F. Supp. 2d 1159, 1164 (S.D. Fla. 1999) (citing Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1082 (10th Cir. 1997); Hilburn v. Murata Electronics N. Am., 17 F. Supp. 2d 1377, 1383 (N.D. Ga. 1998); 29 C.F.R. § 1630.8. Here, Plaintiff told Ms. Lumpkin that her pregnancy was complicated, that she had pregnancy diabetes, and that she had a high-risk pregnancy. Plaintiff also told Christy Trueblood, who told Mr. Witt (as they were married). These disclosures all happened

before Plaintiff left the DEP. Moreover, it is undisputed that NorthStar learned of these issues with Plaintiff's child before it terminated her.

For the same reasons as stated above regarding Plaintiff's FCRA claim, Plaintiff has produced evidence of direct evidence, causation, and pretext. Plaintiff made it clear she had a high-risk pregnancy before the transfer, and it became even more apparent after it (and before she was terminated). An employer may be liable for associational disability discrimination when it terminates an employee based on an unfounded assumption regarding the employee's need for future leave to care for a disabled person. <u>Tyndall v. National Educ. Centers, Inc. of California</u>, 31 F.3d 209 (4th Cir. 1994), a case cited by NorthStar on page 29 of its Motion. A defendant's unfounded assumption regarding the employee's need for future leave to care for her child would violate the RA. Moreover, allowances for remote work were given to other employees – including but not limited to during the worst times of COVID.

## V.    **CONCLUSION**

The Defendants' Motions for Summary Judgment should both be denied for the foregoing reasons.

Respectfully submitted,


/s/  Marie A. Mattox
Marie A. Mattox [FBN 07396875]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
ATTORNEY FOR PLAINTIFF

## **CERTIFICATE OF FONT/WORD COUNT**

I HEREBY CERTIFY that the foregoing contains 6842 words and is typed in

Times New Roman font, 14 point.

/s/  Marie A. Mattox
Marie A. Mattox

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to all counsel of record CM/ECF E-Filing this 16th day of September 2022.

/s/  Marie A. Mattox
Marie A. Mattox